*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-AA-612

**09/28/2017**

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

NERY S. ROCHA-GUZMÁN,

PETITIONER,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES,

RESPONDENT,

and

HARIS DESIGN & CONSTRUCTION COMPANY, *et al.*,[*]

INTERVENORS.

On Petition for Review of Decision and Order of the District of Columbia
Department of Employment Services Compensation Review Board
(CRB-006-14)

(Submitted May 7, 2015                    Decided September 28, 2017)

*Michael J. Kitzman* was on the brief for petitioner.

*Eugene A. Adams*, Interim Attorney General for the District of Columbia at the time the statement was filed, *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, and *Donna M. Murasky*, Senior Assistant Attorney General, Office of the Solicitor General, filed a statement in lieu of brief for

---

[*] There is a discrepancy in the parties' filings with respect to the spelling of the intervening party's name. This opinion refers to the intervenor as Haris Design & Construction Company.

respondent.

*Mary G. Weidner* was on the brief for intervenors.

Before GLICKMAN and EASTERLY, *Associate Judges*, and RUIZ, *Senior Judge*.

RUIZ, *Senior Judge*: This petition for review arises from Nery Rocha-Guzmán's claim for worker's compensation benefits due to permanent total disability resulting from an injury sustained while working for his former employer, Haris Design & Construction Co. ("Haris Design"). Petitioner seeks review of an order of the District of Columbia Department of Employment Services ("DOES") Compensation Review Board ("CRB") which affirmed a compensation order issued by DOES Administrative Hearings Division Administrative Law Judge ("ALJ") Linda F. Jory denying petitioner's claim. We hold that the CRB erred in affirming the ALJ's compensation order, and thus remand the case for further proceedings consistent with this opinion.

**I.**

Petitioner worked as a foreman on construction and renovation projects for Haris Design. His primary duties were to convey the English-speaking superintendent's work assignments to the Spanish-speaking construction crew and to monitor the crew's work.

On August 9, 2010, when the crew was short two workers, petitioner filled in for one of the workers. While petitioner was standing on a roof, it gave way, and petitioner's legs went through the roof, causing him injuries. Petitioner initially sought worker's compensation benefits for temporary total disability, which the parties stipulated arose out of his employment with Haris Design, and the employer paid two lump-sum payments. After receiving treatment for his injuries, petitioner returned to work in November or December of 2010. However, in February 2011, petitioner's employment with Haris Design was terminated on the basis of a review of the employer's personnel records which revealed insufficient documentation that petitioner, who came to this country from Bolivia, was authorized to work in the United States. Two years later, petitioner sought permanent total disability benefits as of April 2013, claiming that his medical condition had worsened in the intervening period and he was no longer capable of performing any work duties.

Following an evidentiary hearing, the ALJ concluded that petitioner had not established that he was permanently and totally disabled as a result of a work-related injury — that is, that his work injury prevented him from returning to his pre-injury job. In reaching this conclusion, the ALJ found petitioner's testimony about his injury and disability to be "blatantly incredible" based, in part, on

petitioner's request for an interpreter during the hearing. The ALJ also noted that petitioner had returned to his pre-injury job as a foreman, and was working in that position at the time of his termination in 2011. Further, the ALJ credited the testimony of the president of Haris Design that, with proper documentation, petitioner would have still been in Haris Design's employ in 2013.[1] In short, the ALJ found that it was petitioner's immigration status, not the work-place injury, that explained why petitioner was not employed as a foreman, and denied petitioner's claim for disability compensation.

Petitioner filed an administrative appeal with the CRB, challenging the ALJ's analysis and lack of substantial evidence to support the ALJ's findings. The CRB affirmed, concluding that the ALJ's Compensation Order properly applied the burden-shifting framework set out in *Logan v. District of Columbia Dep't of*

---

[1] The parties stipulated that petitioner did not have work authorization when he was hired by Haris Design in 2007. The testimony was at odds as to whether the employer was aware of this fact at the time. The president of Haris Design testified that petitioner had a Washington Metro Transit Authority certification, which required a "rigorous" background check, implying that it included work authorization. Petitioner testified, however, that although he presented a tax number (ITIN) when he was hired, he had no social security number or permanent residence, and that the employer had promised to sponsor him to obtain the proper documentation, but did not follow through. The ALJ did not make specific findings on this point, but credited Haris Design's contention that it decided to terminate petitioner when a review of its personnel files in 2011 revealed insufficient documentation of his authorization to work.

*Emp't Servs.*, 805 A.2d 237 (D.C. 2002), and that substantial evidence supported the ALJ's determination that petitioner was not a credible witness, and thus had failed to demonstrate that he was totally and permanently disabled. Petitioner filed this petition for review of the CRB's decision pursuant to D.C. Code § 32-1522 (b)(3) (2012 Repl.).

## II.

On petition for review of a case involving worker's compensation, we review the decision of the CRB. *See Jones v. District of Columbia Dep't of Emp't Servs.*, 41 A.3d 1219, 1221 (D.C. 2012). We will set aside the CRB's decision if it is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C. Code § 2-510 (a)(3)(A) (2012 Repl.). The standard the CRB must apply in reviewing compensation orders is well established. "[O]ur cases require that (1) the [ALJ's] decision must state findings of fact on each material, contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must follow rationally from the findings." *Stewart v. District of Columbia Dep't of Emp't Servs.*, 606 A.2d 1350, 1351 (D.C. 1992). "Substantial evidence is more than a mere scintilla . . . [and] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muhammad v.*

*District of Columbia Dep't of Emp't Servs.*, 774 A.2d 1107, 1111 (D.C. 2001) (quoting *Stewart*, 606 A.2d at 1351). Whether a compensation order is supported by substantial evidence "presents an issue of law which this court is in a position to address without need for deference to the agency's decision." *Id.* at 1110 (quoting *Wash. Metro Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 683 A.2d 470, 476 (D.C. 1996) ("WMATA I").

## III.

Petitioner makes two arguments for reversal, both of which were also presented to the CRB: first, that the ALJ improperly applied the *Logan* burden-shifting framework for analyzing evidence of total disability claims, and second, that the ALJ committed legal error in the consideration of evidence to determine that petitioner was not a credible witness. We disagree on the first point, but agree on the second and remand for proper reconsideration of the evidence presented.

### A. *Logan* Burden-Shifting Framework

*Logan* adopted a three-step burden-shifting analysis for worker's compensation claims of total disability, whereby: (i) "a claimant establishes a

*prima facie* case of total disability," (ii) "the employer [then] must present sufficient evidence of suitable job availability to overcome a finding of total disability," and finally, (iii) the claimant "refute[s] the employer's presentation . . . either by challenging the legitimacy of the employer's evidence of available employment or by demonstrating diligence, but a lack of success, in obtaining other employment." *Logan*, 805 A.2d at 243 (adopting burden-shifting approach for adjudication of claims under the federal Longshoreman's Act set out, *inter alia*, in *Crum v. Gen. Adjustment Bureau*, 738 F.2d 474, 479 (D.C. Cir. 1984)). We have described the claimant's initial burden of making a prima facie case as requiring a showing of "an inability to return to his usual employment," or "an inability to perform his or her usual job." *Id.* at 242 (quoting *Crum*, 738 F.2d at 479). To make a prima facie case, the plaintiff's burden is to prove total disability by a preponderance of the evidence. *See Wash. Metro Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 1276, 1282 (D.C. 2010) ("WMATA II"); *Golding-Alleyne v. District of Columbia Dep't of Emp't Servs.*, 980 A.2d 1209, 1215-16 (D.C. 2009).

Petitioner contends that the ALJ and the CRB did not follow the *Logan* framework by "skip[ping] step one, establishing a *prima facie* case of disability, and proceed[ing] instead to a hybrid of steps two and three." According to

petitioner, he established a prima facie case for disability through the reports of his doctors and vocational counselor, and the ALJ improperly considered evidence presented by the employer (employer's testimony that petitioner was able to resume his usual duties when he returned to work in late 2010, and could have remained in Haris Design's employ but for his undocumented work status) in determining that he had failed to do so.

We disagree with petitioner's contention that proper application of the *Logan* burden-shifting framework precludes the ALJ's consideration of the employer's evidence in determining whether a claimant's initial burden to present a prima facie case of total disability preventing return to prior employment has been satisfied. That the ALJ may consider the employer's evidence in making this determination is implicit in the claimant's burden, in "step one" of the *Logan* analysis, to prove disability by a preponderance of the evidence, which requires a weighing of all the evidence presented.[2] *Logan's* burden-shifting framework does not dictate the order in which evidence may be presented or admitted during a hearing or procedurally constrain the ALJ's consideration of evidence. As long as

---

[2] *See Preponderance of the Evidence*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "preponderance of the evidence" as "the greater weight of the evidence" presented "in which the [fact-finder] is instructed to find for the party that, on the whole, has the stronger evidence").

the ALJ considers evidence relevant to each step, and applies the shifting burdens of proof to the subject of each step, the order in which evidence is presented, admitted, and/or reviewed does not necessarily matter.[3] Accordingly, in considering whether a claimant has made a prima facie case of permanent total disability under "step one," i.e., inability to return to his *usual* employment or perform his *usual* job duties due to a work-related injury, the ALJ may consider relevant evidence presented by the employer, such as that the claimant had, in fact, returned to his former job and performed the same functions. Such evidence would not pertain to *Logan's* "step two" inquiry — whether the employer has met its burden to show there are *other* suitable jobs available that might change the claimed disability from total to partial — but instead, would directly negate claimant's evidence relevant to "step one." We, therefore, conclude that the CRB did not err in its determination that in this case the ALJ could properly consider the employer's evidence that petitioner returned to work after the work accident in

---

[3] *Cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 533 n.9 (1993) (Souter, J. dissenting) ("In a bench trial, for example, the parties may be limited in their presentation of evidence until the court has decided whether the plaintiff has made his prima facie showing. But the court also may allow in all the evidence at once."). *See also* Stephen W. Smith, *Title VII's National Anthem: Is There A Prima Facie Case for the Prima Facie Case?* 12 LAB. LAW. 371, 379 (1997) ("The real-life sequence of a Title VII trial thus bears little resemblance to the *McDonnell Douglas* three-step [framework]."); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).

determining whether he met his burden of presenting a prima facie case under the first step of the *Logan* burden-shifting framework.

## B. Credibility Determination

The ALJ's determination that petitioner was not a credible witness was a significant factor in the ALJ's and CRB's decision that petitioner did not meet his burden of establishing that he was totally disabled. Credibility determinations are within the discretion of the ALJ, and typically are "entitled to great weight" due to the ALJ's unique ability to hear and observe witnesses first hand. *WMATA I*, 683 A.2d at 477. Petitioner argues that notwithstanding this deference, the ALJ's determination in this case that he was not credible cannot be sustained because it rested, at least in part, on an impermissible consideration: petitioner's request for and use of an interpreter during the hearing. We agree.

Persons with limited English proficiency are legally entitled to an interpreter in administrative proceedings.[4] Thus, we would not countenance an ALJ's

---

[4] *See* D.C. Code § 2-1902 (c) (2012 Repl.) (providing that in administrative proceedings a qualified interpreter "shall" be appointed "upon the request of the communication-impaired person"). *See generally* Guidance to Federal Financial

(continued . . .)

decision to discredit a witness of limited English proficiency on the basis that the witness requested an interpreter or testified with the assistance of an interpreter. This is so even if the witness had some acknowledged or observable understanding of English.[5] We, therefore, scrutinize carefully the ALJ's comments about petitioner's English proficiency and request for an interpreter in this case.

The determination that petitioner was not credible was an inference based on the ALJ's opinion that petitioner's request for an interpreter was unwarranted because, according to the ALJ, petitioner was "clearly" able to understand more English than he was willing to admit.[6] The ALJ was also of the opinion that

_____

(. . . continued)

Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455-01 (June 18, 2002) ("In certain circumstances, failure to ensure that [Limited English Proficient] persons can effectively participate in or benefit from Federally assisted programs and activities may violate the prohibition under Title VI of the Civil Rights Act of 1964 . . . and Title VI regulations against national origin discrimination.").

[5] *See* D.C. Code § 2-1901 (2) (2012 Repl.) (defining a "communication-impaired person" as "a hearing-impaired person or a non-English or limited-English speaking person").

[6] The ALJ commented that petitioner "requested a translator yet he clearly was able to understand the questions asked in English and on many occasions answered questions in English before the translator finished translating the question from English to Spanish."

petitioner had not been truthful when he said that he had "a little bit of difficulty understanding" the English language. This opinion was based on another inference, that petitioner was sufficiently proficient in English for purposes of the legal proceeding because as part of his job at Haris Design petitioner had to convey instructions given to him in English to a Spanish-speaking construction crew. Although the fact-finder may make findings based on reasonable inferences from the evidence, on this record, the inferences made were not reasonable.

First, a person's ability to carry out functions at certain jobs or in commonplace interactions using English does not necessarily mean that the person is equipped to navigate the complex, stressful, and often unfamiliar terrain of a legal proceeding with important consequences and the potential for waiver of legal rights. *See* American Bar Association Standards for Language Access in Courts 1 (2012) ("[A] high level of English proficiency is required for meaningful participation in court proceedings due to the use of legal terms, the structured nature of court proceedings, and the stress normally associated with a legal proceeding when important interests are at stake."); *id.* at 11 (defining "Limited English Proficient Person" as "someone who speaks a language other than English as his or her primary language and has a limited ability to read, write, speak or understand English"); *id.* at 7 (defining "court" as including administrative

tribunals). There is no evidence concerning the nature or complexity of the instructions petitioner was asked to convey to the construction crew or the English proficiency level required to do so and how it compared to a legal proceeding. Before the ALJ could draw an inference adverse to petitioner's credibility based on the nature of his work, the ALJ had to ascertain the truth of the premise (that petitioner's work required comparable English proficiency) for the inference that petitioner was dissembling when he asked for an interpreter at the hearing. There is reason to doubt the premise on this record, based on evidence the ALJ appears to have overlooked. For example, the ALJ did not consider petitioner's testimony about the laborious process he undertook to be able to translate the work instructions each day.[7] Nor did the ALJ take note that most of the medical reports indicate that an interpreter was present during the office visits — occasions when it was important that nuances in language be well understood and communicated. Similarly, the vocational assessment report notes that although petitioner "speaks and comprehends basic English . . . he was more comfortable responding in Spanish, and some concepts were more easily understood by [him] in Spanish." The ALJ also did not consider that petitioner may have been able to respond to

---

[7] Petitioner testified that his supervisors would provide him with the English instructions "[a]nd I would try and translate them at my house for the night." He further clarified that "I would translate it at home and with the dictionary I would translate it. And I would have it ready."

questions in English during the hearing *because* of the language assistance he was receiving from the interpreter.

We do not, on appeal, make credibility determinations. However, we review such determinations to see whether they are supported by substantial evidence on consideration of the entire record. *See Dent v. District of Columbia Dep't of Emp't Servs.*, 158 A.3d 886, 905 (D.C. 2017). An ALJ's assessment of credibility should consider the testimony "in [] light of its rationality, internal consistency, and the manner in which it hangs together with evidence of the record." *Russell v. Wash. Metro Area Transit Auth.*, CRB No. 03-241, 2005 WL 3440463, at *2 (Sept. 28, 2005). The record in this case, viewed as a whole, does not support that petitioner's request for an interpreter at the hearing was a sham. It is for the ALJ to assess petitioner's credibility anew on remand, without improperly relying on petitioner's request for and use of an interpreter, and taking into account all the evidence of record bearing on petitioner's English proficiency.

**C. Remand**

As the case is being remanded for further consideration, we make several observations about problematic aspects of the reasoning in the underlying

compensation order that are likely to arise upon further consideration.

1.  *The Relevant Time-Frame*

Petitioner's claim was for total permanent disability from April 2013. He contends that his brief return to work more than two years earlier, in late 2010, was largely irrelevant to determining whether he currently suffers from permanent total disability. Yet the ALJ appears to have been focused on that earlier period, possibly because that is when petitioner had returned to work before he was terminated.[8] For example, in considering the medical evidence presented, the ALJ

---

[8] In finding that petitioner had not made a prima facie case of permanent total disability, the ALJ placed significant weight on the employer's testimony that petitioner would not have been terminated in February of 2011, and would therefore still be working for Haris Design, but for its review of personnel records that revealed insufficient documentation of petitioner's work authorization. The CRB approved of this reasoning. Neither the ALJ's Compensation Order nor the CRB's Order explains in detail how this testimony factored into their analysis. If all that is meant is that there was no inability to work resulting from the work accident that impeded petitioner's employment, it would be a valid analysis for purposes of worker's compensation. It would be improper, however, to identify petitioner's termination in February 2011 as the relevant time to assess petitioner's disability claim on the ground that lack of documentation impeded petitioner's continued employment. The law is clear that undocumented workers are eligible for worker's compensation benefits in the District of Columbia. *See Asylum Co. v. District of Columbia Dep't of Emp't Servs.*, 10 A.3d 619, 628 (D.C. 2010). It is equally clear that "the fact that an employee may be unable to work for reasons beyond his injury [such as lack of documentation] does not affect his entitlement to benefits, as long as the injury independently causes that disability." *Id.* at 630 & n.16 (quoting definition of "disability," D.C. Code § 32-1501(8) (2012 Repl.)).

(continued . . .)

relied primarily on two outdated medical reports and to have dismissed (or overlooked) numerous other medical reports and a vocational assessment that were closer in time to the claimed onset of permanent total disability.

In her factual findings, the ALJ listed a series of medical reports, highlighting the December 13, 2010, report by Dr. Ross S. Myerson, an independent medical examiner, and the April 6, 2012, report by one of petitioner's treating physicians, Dr. Fredric L. Salter, both of whom stated that petitioner was fit for light duty work.[9] The ALJ notes, but does not discuss, numerous reports during the period from May 2011 to September 2013, by petitioner's treating physicians at Phillips & Green in which multiple doctors (including Dr. Salter) state that petitioner was unable to work.[10] The most recent report of Dr. Myerson

_____

(. . . continued)

Therefore, even if petitioner was undocumented in 2011 (a matter on which we express no opinion), that fact would be of no consequence to the question before the agency: whether the evidence presented supports that petitioner was permanently and totally disabled in 2013 as a result of the work-place injury he sustained in 2010. See notes 10-11 *infra*.

[9] In a medical report dated November 19, 2010, Dr. Salter changed petitioner's work status from unfit to return to work to light-duty employment, but noted that this was done "at the [petitioner's] request" and "because of [petitioner's] financial concerns."

[10] Petitioner's medical evidence included close to 30 progress reports,

(continued . . .)

(the IME), dated May 20, 2013, concurred, stating: "I do not believe that Mr. Rocha-Guzman could return to work in any capacity." In this conclusion, the IME and the treating physician were in accord after both examined petitioner in 2013.[11]

_____

(. . . continued)

beginning in 2010, from his doctors at Phillips & Green detailing his condition. From November 2010 to February 2011, the reports state that petitioner is able to perform light duty work. However, beginning on May 26, 2011, petitioner is found to be unfit for any work. All subsequent reports reiterate the same finding with the exception of one report, by Dr. Salter, on April 6, 2012. This is the report the ALJ focused on. Following Dr. Salter's April 2012 report, all progress reports — including a report by Dr. Salter himself five months later on September 6, 2012 — until the final report on September 4, 2013, find petitioner unfit to return to work. These reports list the tests that have been performed, including MRIs of the back and right hip (2011), electromyogram and nerve conduction study of the lower back (2010), and current physical observations and examinations, as well as petitioner's reports of pain. The report that was closest in time to the hearing on November 19, 2013, was the report dated September 4, 2013, signed by Dr. Jeffrey H. Phillips. After speaking to petitioner and examining him, Dr. Phillips opined that petitioner's right hip pain is "post-traumatic and caused by the accident of 8-9-10." He also stated that petitioner has been "experiencing left upper extremity pain, which I believe within a reasonable degree of medical certainty, is absolutely related to his original injury of 8-9-10." Dr. Phillips concluded by saying: "I do not see how this patient can be working and do not anticipate his returning to work in the foreseeable future."

[11] Although, the IME and treating physician agreed that petitioner was permanently totally disabled in 2013, they differed in their opinions as to whether petitioner's disability resulted from the injuries petitioner sustained while employed at Haris Design. These differing opinions would usually require the ALJ to evaluate and credit one over the other and, if the treating physician's opinion is discredited, to explain why. *See White v. District of Columbia Dep't of Emp't Servs.*, 793 A.2d 1255, 1258 (D.C. 2002) ("In evaluating the evidence of record . . . [DOES] must take into account the testimony of a treating physician, which is ordinarily preferred over that of a physician retained solely for litigation purposes.

(continued . . .)

Despite the unanimity of reports finding petitioner unable to return to work in 2013, the ALJ highlighted, without explanation, the outliers — an April 6, 2012, progress report by Dr. Salter, even though it was superseded by Dr. Salter's later reports on September 6, 2012, and January 2, 2013, and an outdated (2010) and subsequently revised opinion by the IME — in support of her conclusion that petitioner did not present a prima facie case of total permanent disability. The ALJ also made no mention of the vocational assessment prepared in April 2013 by Trudy Koslow, finding that petitioner was unable to return to work.[12] On remand, the ALJ should consider all evidence presented that pertains to the relevant time-

_____

(. . . continued)

Though a hearing examiner may reject the testimony of a treating physician and decide to credit the testimony of another physician when there is conflicting medical evidence . . . the agency must give reasons for such a rejection."). In this case there is no need for such a comparative analysis and explanation, however, as the employer stipulated that petitioner's "alleged disability is causally related to the work injury on August 9, 2010." As set out in the Compensation Order, the only issue before the ALJ was the "nature and extent" of that disability.

[12] The vocational assessment, dated April 2013, is based on a review of petitioner's medical records and an in-person interview with petitioner on February 20, 2013. Ms. Koslow concludes that "[i]t is [her] professional opinion, within a reasonable degree of certainty as a vocational rehabilitation counselor, that Mr. Rocha-Guzman is unable to obtain and/or sustain gainful competitive employment at this time." She notes that petitioner was able to return to work in 2010 in a light-duty position but "due to orthopedic complaints, dizziness, and balance issues, Mr. Rocha-Guzman was unable to perform the tasks of his position." He had since "made several attempts to return to work between 2010 and 2012, without success."

frame of the claimed permanent total disability and make necessary credibility determinations and findings with respect to the medical reports (giving due regard to the treating physicians) and vocational assessment report.

### 2. *Substantial Evidence*

We discern a similar failure to consider all the evidence relevant to what the ALJ labeled as "inconsistencies" in petitioner's description of the fall that led to his injuries and in his complaints of pain to his doctors. The ALJ noted that during the hearing, petitioner testified that he fell "towards the left side and hurt the left side of his face" and later testified that he felt "heat" in his right knee and hip. The ALJ indicated that when treated by Dr. Mayer in September 2010, petitioner said he struck the right side of his head, which led to headaches, and complained of pain radiating down his right side, after he had told Dr. Phillips two weeks earlier that he had pain in his neck and lower back as well as pain radiating down his left leg. Even if there was some discrepancy between petitioner's testimony at the hearing and his report to Dr. Mayer three years earlier as to which side of the face was hit as petitioner fell through the roof at the construction site, it cannot be viewed in isolation. The record shows that petitioner was referred for a neurological consultation by his orthopedic doctors. Dr. Vandana Sharma, a neurologist, treated petitioner from September 2010 to April 2012. Dr. Sharma

ordered a brain MRI in 2011, and diagnosed petitioner with post-concussion syndrome with persistent headaches, dizziness, blurred vision and difficulty concentrating; post-traumatic cervical, thoracic and lumbar sacral strain syndrome; and pain and paresthesia of the lower extremities.  In his report dated September 4, 2013, Dr. Phillips attributed petitioner's pain in the left upper extremity *and* the right hip to the 2010 work injury.  On this record, reports of pain in different parts of the body are not necessarily inconsistent or implausible as the sequelae of an injury that had neurological implications.  Further fact finding, grounded on medical evidence, is required before testimony can be discredited as "inconsistent."

* * *

The decision on review is hereby reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*